NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

10th Circuit Court-Brentwood Family Division
No. 2016-0160

IN RE S.T.

Argued: October 6, 2016
Opinion Issued: November 29, 2016

Joseph A. Foster, attorney general (Elizabeth A. Lahey, assistant attorney general, on the brief and orally), for the petitioner.

Fitzgerald-Boyd Law PLLC, of Plaistow (Jacqueline C. Fitzgerald-Boyd on the brief and orally), for the respondent.

LYNN, J. The respondent, the mother of a minor child, appeals the order of the Circuit Court (Weaver, J.) terminating her parental rights over the child. See RSA ch. 170-C (2014 & Supp. 2015). On appeal, the mother argues that the trial court erred by: (1) granting the petition brought by the petitioner, the New Hampshire Division of Children, Youth and Families (DCYF), to terminate her parental rights while the direct appeal of her underlying criminal conviction was pending; and (2) finding that termination of her parental rights was in the best interest of the child. We reverse and remand.

I

The relevant facts follow. The child was born on September 17, 2013, to the mother and her boyfriend, the child's natural father (the father). A court

order prohibited the father from having any unsupervised contact with the child and the mother's two other children.

On October 21, DCYF received a report that the mother had brought the child to a doctor with concerns about "red eyes." The doctor determined that the child was suffering from bilateral conjunctival hemorrhages, and reported that the mother had expressed concern that the father might be hurting the child. The doctor reported that the injuries appeared to be suspicious in nature and referred the child to the emergency room for further examination. On October 22, DCYF was informed that a skeletal survey of the child had indicated multiple fractures of varying ages that were consistent with non-accidental trauma. DCYF brought an ex parte petition seeking removal of the child from the parents' care on grounds that the child "is in imminent danger based on the injuries that she has sustained, the inability of [the father] and [the mother] to follow the existing court orders and the fact that the injuries were consistent with non-accidental trauma." The petition was granted, and the child was placed in a foster home.

On October 24, DCYF filed petitions, based upon the child's injuries, alleging abuse and neglect of the child by the father, and neglect by the mother. See RSA 169-C:3, II(b), (d), XIX(b) (Supp. 2015). On December 11, DCYF amended the abuse and neglect petitions to allege an incident involving the child in which the father "had the baby wrapped up against his body and [the mother] grabbed the child's legs and pulled and he twisted to pull the baby away." According to the doctor who examined the child, it was possible that some of the child's injuries that she had identified on October 22 "could be consistent with the description of the tugging that occurred between the parents."

Also on December 11, the father and mother were arrested and charged with second degree assault of the child based upon the October incident. The mother was granted bail. The father subsequently pleaded guilty to eight counts of second degree assault and received an eight-to-sixteen-year sentence.

Following a hearing on December 18, the trial court found that the father had abused and neglected the child in that he "admitted to the police and [DCYF] that he had a tug of war with the infant which resulted in at least some of her many fractures. Additionally, [he] had the opportunity to cause further injuries by having unsupervised time with [the child] in violation of this court's order." The court found that the mother had neglected the child because she

> continued to minimize the risk that [the father] posed to her children. On several occasions, she allowed [the father] to care for [the child] unsupervised in violation of this Court's order, which placed the child at risk of serious harm. Additionally, [the mother] engaged in reckless conduct by tugging on [the child's] legs in an

2

effort to get the [child] away from [the father]; their [actions] very likely resulting in serious harm to [the child].

The court awarded legal custody of the child to DCYF because the mother "does not recognize the potential risk to [the child], as demonstrated by repeated violations of court orders related to [the father] having contact with the kids. [The mother's] minimization of the risk to [the child] coupled with her inappropriate handling of the child place [the child] at continued risk of harm in her care."

On June 12, 2014, DCYF moved to modify the outstanding dispositional orders to: (1) "reunify the child with" the mother; (2) "remove the child from DCYF's legal custody and instead vest DCYF with legal supervision"; and (3) "modify the permanency plan from 'reunification' to 'maintain in the home.'" In support, DCYF stated that the mother had "made significant progress in attending to and managing the needs of her children," had "continued to actively engage in services and ha[d] successfully completed case plan goals," and had "increased frequent and liberal parenting time with [the child], even extended unsupervised parenting time encompassing the majority of each of several weeks, and ha[d] demonstrated her ability to safely parent her." The trial court granted the motion.

On July 10, DCYF moved ex parte to withdraw its June 12 motion, stating that the mother had been charged with shoplifting which, in turn, had caused the State to move to revoke her bail, and that "[t]hese factors have caused a significant increase in stress" for the mother, thereby "adversely impact[ing] her ability to consistently parent." In addition, as a result of the mother's increased stress being conveyed to her children, her son had become "increasingly volatile, acting out aggressively, mostly toward [the child]," and, because of the son's behavior, DCYF was "not satisfied that [the child] can be safe in the care of her mother." The trial court granted the motion, and the child was placed in a foster home.

On October 7, the child was again reunified with her mother until January 30, 2015, when the mother was convicted by a jury of second degree assault based upon the October 2013 "tug of war" incident and incarcerated. See RSA 631:2 (2016). At that time, the child was placed in the care of her maternal grandparents. At a review hearing on February 6, the trial court found that DCYF "has provided services to [the mother] throughout this case which enabled her to safely reunify with her daughter. The current removal is outside of the Division's control and not related to any current child safety concern other th[a]n the mother's incarceration." The court also found that the mother was "in substantial compliance" with the case plan wherein she had "attended parenting classes and engaged in mental health treatment," and the court recommended that she continue with those services. The court ordered

3

that DCYF have legal supervision of the child, and that physical custody remain with the child's maternal grandparents.

The mother was subsequently sentenced on the second degree assault conviction to serve 10 to 20 years, with three years suspended for good behavior. DCYF thereafter sought a permanency order allowing it to place the child in foster care with the goal of adoption. After a review hearing on April 14, 2015, the trial court awarded legal custody of the child to DCYF, with placement to continue with the child's maternal grandparents. The court noted that "[a]lthough the mother and DCYF had hoped that a short prison sentence would be imposed, . . . [a]s a result of the incarceration of both the mother and the father, the reunification of the child with her parents is in doubt."

On May 19, the trial court held a permanency hearing. See RSA 169-C:24-b (2014). The court found that twelve or more months had passed since the finding of abuse and neglect in December 2013, and that the child had been in out-of-home placement for a minimum of twelve months since October 21, 2013. See RSA 169-C:24-a, I(a) (2014). The trial court also found that DCYF had made "reasonable efforts to finalize the permanency plan of reunification" between the child and her mother. Although the mother was found to be "in substantial compliance" with the outstanding dispositional orders because she had "participated in parenting classes, and engaged in mental health treatment," and had "actively worked with DCYF and services in order to correct conditions that led to [the child] being injured," the court concluded that the conditions leading to the child's removal had not been corrected because "her current incarceration prevents her from reunifying with [the child] within a reasonable time frame."

The trial court found that the mother could not demonstrate that, if returned home, the child would not be endangered in the manner adjudicated on the initial neglect petition because:

> [The mother] was convicted on second degree assault charges against [the child]. She is currently serving a ten to twenty year prison sentence with three years suspended from the minimum sentence. Through her criminal case she is ordered to complete parenting classes and . . . an anger management program during her incarceration. She is also receiving mental health treatment. However, due to the length of her sentence, [the mother] will not be able to demonstrate within the recommended permanency time frame that she has successfully addressed parenting and mental health issues, including anger management so that [the child] would not be endangered in the manner adjudicated on the original petition.

4

The court ordered DCYF to file a termination of parental rights (TPR) petition against the mother within 30 days. It also ordered that "DCYF is no longer required to provide reasonable efforts to facilitate reunification between" the child and the mother, and that DCYF explore adoptive home placements. Legal custody was awarded to DCYF, and the court ordered that the child remain in her maternal grandparents' care.

On July 10, DCYF petitioned for termination of the mother's parental rights pursuant to RSA 170-C:5, on the grounds that she was incarcerated for a felony and had been found, pursuant to RSA chapter 169-C, to have abused and neglected her child, see RSA 170-C:5, VI, and that she was convicted of a felony assault under RSA 631:2 which resulted in injury to the child, see RSA 170-C:5, VII(d). In support, the petition alleged that "[t]he nature of the conviction and the length of incarceration will deprive [the child] of proper parental care and leave her in an impermanent environment for a longer period of time than would be prudent."

Prior to the final hearing on the termination petition initially scheduled for December 15, DCYF filed a motion to continue the hearing on grounds that the mother "has appealed her criminal convictions to the NH Supreme Court" and that "[a]lthough the State is prepared to proceed to termination, a continuance of 60 days may provide finality to the criminal process." DCYF noted that it was proceeding with the permanency plan for the child, that the child had visited with a foster family that was prepared to adopt her should she be freed for adoption, and that because it was in the process of transitioning the child from her grandparents' care to the foster home, "[a] brief continuance will not adversely impact [the child]."

The trial court held the final hearing on the TPR petition on February 9, 2016, and found that DCYF had met its burden and granted the petition. The court found that "there is no question but that the statutory grounds have been established beyond a reasonable doubt." The court concluded that because the mother had been convicted of a felony assault against the child that had resulted in serious injuries to the child, the requirements of RSA 170-C:5, VII(d) had been met. The court rejected the mother's argument that the conviction was not final because it was on appeal, reasoning that "[t]o hold otherwise would leave the child in legal limbo while her mother makes her way through the appellate process. That process can take years, and therefore, the Court finds the conviction in this case meets the statutory test even though it is still subject to appellate review." The court also found that DCYF had met its burden under RSA 170-C:5, VI "as the evidence established beyond a reasonable doubt that [the mother], as a result of her current incarceration for 7 to 20 years, is unable to perform her parental responsibilities to [the child] and she has been found to have neglected [the child]." The court reasoned that the mother's "incarceration is of a long enough period that if her rights are not

terminated, [the child] will be deprived of proper parental care and protection and left in an unstable and impermanent situation."

On March 8, we issued an order reversing and remanding the mother's conviction. We concluded that the trial court erred by excluding evidence that the child's father had threatened the mother's only witness prior to the witness's first interview at the Child Advocacy Center. We also concluded that the mother was prejudiced by the exclusion of that evidence "because it precluded her from rehabilitating her only witness, who was also the only witness to the 'tug-of-war'" incident that resulted in the assault charge. As we explained,

> A police officer testified to [the mother's] various accounts of the "tug-of-war." He described [the mother] as saying that the father was holding [the child] and she grabbed [the child's] legs and "yanked" them for about five minutes "with everything she had." However, the witness's testimony gave a different character to [the mother's] participation in the "tug-of-war." The witness testified that [the mother] tried to get [the child] away from the father, who was angry, to comfort [the child] and that the father "started to yank [the child] away from" [the mother]. Furthermore, the witness described [the mother's] actions in caring for [the child] and the father's mistreatment of [the child] on other occasions. This testimony was critical to the defense's argument regarding the father's mistreatment of [the child].

> The State's cross-examination of the witness regarding her prior inconsistent statements created the impression that the witness had fabricated her testimony to benefit [the mother]. Explaining these statements as having been the result of a threat could have rehabilitated the witness.

(Brackets omitted.)

Following our decision, the mother requested that the trial court reconsider its order granting the TPR petition. The trial court noted that it had previously considered the possibility of a reversal on appeal, but concluded that the mother's "continued incarceration, which is not over given that the case has been remanded for a new trial, places her daughter in an unstable and impermanent environment for a longer period than would be prudent, given the history of this case, leaving [the child] without proper parental care." Given the fact of the mother's incarceration, "and the prior conviction and finding of neglect," the trial court denied the motion. This appeal followed.

6

## II

On appeal, the mother argues that the trial court erred in terminating her parental rights "without knowing the outcome of the criminal conviction appeal and finding that the statutory ground had been met beyond a reasonable doubt." (Bolding and underlining omitted.) She asserts that because the statutory basis for the TPR petition was that she was convicted of and incarcerated for a felony assault, and because the effect of our reversal of her conviction "vacates the 'guilty' finding[,] she is now in the same place as she was prior to the conviction. She is facing charges but she is not 'convicted.'" Thus, she argues that terminating "a natural, essential and inherent parental right" of a parent whose conviction has been vacated when that conviction was the basis of the petition, "is unjust and denies [her] her fundamental liberty interest." She also argues that the trial court erred in determining that terminating her parental rights was in the best interest of the child.

DCYF counters that based upon "the plain language, policy, and[ ] legislative history of RSA 170-C:5, VI and VII(d)," the trial court could, as a matter of law, terminate the mother's parental rights while the direct appeal of her criminal conviction was pending. DCYF argues that these statutory provisions "require only that the State prove that the parent at issue has been convicted of a felony at the time of the termination hearing, not that the parent has been convicted and that all relevant appellate periods have expired." To conclude otherwise, DCYF argues, "would require children . . . to remain in legal limbo, languishing in the foster system for years while their parents exhaust all direct and collateral appeals related to their convictions," a result that would be "at direct odds" with the purposes of RSA chapter 170-C, "which are to make foster care temporary and provide timely, permanent placements for children." DCYF also asserts that the trial court properly ruled that termination was in the child's best interest. Because we conclude that it was error to terminate the mother's parental rights before the resolution of the direct appeal of her conviction, we need not address whether the termination was in the best interest of the child.

## III

Before a court may order the termination of parental rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt. In re C.M., 166 N.H. 764, 773 (2014). Once a statutory ground is established, the court must then consider whether termination is in the child's best interest. Id. The trial court's ruling should not be disturbed unless it is unsupported by the evidence or plainly erroneous as a matter of law. In re Zachary G., 159 N.H. 146, 153 (2009).

7

In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole.  In re C.M., 166 N.H. at 774 (quotation omitted).  We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning.  Id. (quotation omitted).  We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  Id. (quotation omitted).  We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result.  Id. (quotation omitted).  We employ a de novo standard of review.  Id.

IV

The provisions of RSA chapter 169-C, the Child Protection Act, and RSA chapter 170-C, the Termination of Parental Rights statute, together set forth the procedures that apply to adjudicating petitions alleging abuse and/or neglect, and petitions to terminate the parent-child relationship.  The question before us is whether the terms "convicted" and "conviction" as used in these statutes mean convicted in the trial court after a finding of guilt or whether they mean a determination of guilt after a direct appeal to this court.

The purposes of the Child Protection Act include:  "[p]rotect[ing] the safety of the child"; "[p]reserv[ing] the unity of the family whenever possible"; "[p]rovid[ing] assistance to parents to deal with and correct problems in order to avoid removal of children from the family"; and "[t]ak[ing] such action as may be necessary to prevent abuse or neglect of children."  RSA 169-C:2, I (2014).  The chapter "shall be liberally construed to the end that its purpose may be carried out, to wit, . . . whenever possible," to keep a child in a family environment "by preserving the unity of the family and separating the child from his parents only when the safety of the child is in danger or when it is clearly necessary for his welfare," and "[t]o provide effective judicial procedures through which the provisions of this chapter are executed and enforced and which recognize and enforce the constitutional and other rights of the parties and assures them a fair hearing."  RSA 169-C:2, II(b), (c) (2014).

DCYF is required to file a TPR petition when "a child has been in an out-of-home placement pursuant to a finding of child neglect or abuse, under the responsibility of the state, for 12 of the most recent 22 months" or when "a court of competent jurisdiction" has determined that "the parent has been convicted of a felony assault under RSA . . . 631:2 . . . that resulted in injury to the child."  RSA 169-C:24-a, I(a), (c)(4) (2014).  The statute does not define the term "convicted."  See RSA 169-C:3 (2014 & Supp. 2015).

8

The purpose of the Termination of Parental Rights statute is

> to provide for the involuntary termination of the parent-child relationship by a judicial process which will safeguard the rights and interests of all parties concerned and when it is in the best interest of the child. Implicit in this chapter is the philosophy that whenever possible family life should be strengthened and preserved, and that the parent-child relationship is to be terminated only when the adoption of that child may be contemplated.

RSA 170-C:1 (2014). RSA chapter 170-C "imports the procedural safeguards and substantive requirements of RSA 169-C." In re Zachary G., 159 N.H. at 153.

The statute sets out seven grounds for termination of the parent-child relationship. See RSA 170-C:5, I-VII (2014). In the case before us, DCYF sought to terminate the mother's parental rights based upon RSA 170-C:5, VI and VII(d). RSA 170-C:5, VII was added to the statute in 1999, when the statute was amended "to initiate New Hampshire's compliance with the federal Adoption and Safe Families Act of 1997" (ASFA). Laws 1999, 133:1, :4. The ASFA "is designed and intended to reform parts of the current child welfare system and to promote the safety, permanency, and well being of children in out-of-home placements." Laws 1999, 133:1.

RSA 170-C:5, VI provides:

> If the parent . . . is, as a result of incarceration for a felony offense, unable to discharge [her] responsibilities to and for the child and, in addition, has been found pursuant to RSA 169-C to have abused or neglected [her] child or children, the court may review the conviction of the parent . . . to determine whether the felony offense is of such a nature, and the period of incarceration imposed of such duration, that the child would be deprived of proper parental care and protection and left in an unstable or impermanent environment for a longer period of time than would be prudent. Placement of the child in foster care shall not be considered proper parental care and protection for purposes of this paragraph. Incarceration in and of itself shall not be grounds for termination of parental rights.

Under RSA 170-C:5, VII, termination may be ordered when "[t]he parent has been convicted of . . . [a] felony assault under RSA . . . 631:2 . . . which resulted in injury to the child." RSA 170-C:5, VII(d). The statute does not define the terms "conviction" or "convicted." See RSA 170-C:2 (2014).

9

The meaning of the terms "conviction" and "convicted" in the context of petitions to terminate parental rights raises a question of first impression. Other jurisdictions that have been presented with this question have reached contrasting conclusions. For example, in People in Interest of T.T., 845 P.2d 539 (Colo. Ct. App. 1992), the court held that under its termination statute, the term "conviction" means "convicted upon trial." Interest of T.T., 845 P.2d at 541 (quotation omitted). The mother had been convicted of, among other things, murder and reckless child abuse and sentenced to life imprisonment plus 32 years. Id. at 539-40. The Department of Social Services sought to terminate the mother's parental rights based upon a statutory provision that allows termination upon a finding of "[l]ong-term confinement of the parent of such duration that he is not eligible for parole for at least six years from the date the child was adjudicated dependent or neglected." Id. at 540. The trial court took judicial notice of the mother's conviction and her sentence, and terminated her parental rights. Id.

On appeal, the mother argued that "the six-year period should not be computed until all appeals as of right from a trial court conviction and sentence have been exhausted." Id. In determining the meaning of the term "conviction" in the context of the termination of parental rights, the appellate court looked to the policies set forth in the termination statute. Id. at 540-41. These include that the court is to "place paramount emphasis on the best interests of the child," and that the provisions of the statute are "designed to render a particular parent fit to provide adequate parenting to a child within a 'reasonable' time." Id. at 541. Construing the statute in light of those policies, the court concluded that it was "apparent that the [legislature] intended 'conviction' to mean convicted upon trial" where the accused "has had a complete and full opportunity to be heard on the charges against her and a final judgment against her has been entered." Id. The court reasoned that

> [t]o hold otherwise would be to violate the important policies of [the statute] which seek to assure a child of some degree of permanency in long-term planning and to assure the child of a stable and secure environment as soon as possible. If a termination proceeding were required to be stayed until a parent's appellate rights are exhausted, a child would have to spend an indeterminate time, perhaps a great portion of his youth, in foster or other temporary care at a time when the child needs stability and bonding in his relationships.

Id. (citation omitted); see also Varnadore v. Dept. of Human Resources, 543 So. 2d 1194, 1196 (Ala. App. 1989) (rejecting, as being based upon "mere speculation," mother's argument that the termination was premature because her criminal conviction will be overturned); Matter of Juvenile Severance Action, 785 P.2d 56, 58 (Ariz. Ct. App. 1989) (explaining that nothing in the TPR statute suggests that the juvenile court must wait for the parent convicted

10

of a crime "to exhaust all avenues of appeal before the court may proceed with a severance hearing" because doing so would "indefinitely delay determinations regarding children whose best interests are at risk and require expedient consideration").

By contrast, in In Interest of Kody D.V., 548 N.W.2d 837 (Wis. Ct. App. 1996), the court held that under its termination statute, the term "conviction" means "conviction after the appeal as of right has been exhausted." Kody D.V., 548 N.W.2d at 843. The mother had been convicted of recklessly causing great bodily harm to her child and sentenced to five years' imprisonment. Id. at 839. The County petitioned to terminate the mother's parental rights on the statutory ground that she had been convicted of a felony. Id. The County argued that the term "conviction" as used in the statute "means a conviction at the trial level and that it is irrelevant whether an appeal is pending or, by implication, what the decision of the appellate court is." Id. The mother argued that "conviction means a final conviction after an appeal." Id.

The court found both meanings of the term "conviction" as set forth by the parties to be reasonable in the context of the statute. Id. at 640. As the court reasoned, a judgment of conviction is entered by the trial court after a verdict of guilty by the jury or a finding of guilty by the court and, therefore, it is reasonable to interpret the term "conviction" as used in the statute "as the judgment of conviction entered by the trial court." Id. at 840-41. "On the other hand," the court reasoned that "an appeal is an integral part in our judicial system for a final adjudication of guilt or innocence and serves to protect a defendant against errors in the criminal proceedings," that "[a] defendant has both a statutory and a constitutional right to an appeal," and that therefore it is reasonable to interpret the statute to mean "a conviction after the completion of the appeal as of right." Id. at 841.

The court thus turned to a consideration of "the nature of TPR proceedings, including the constitutional implications," to determine which of the meanings the legislature intended. Id. at 840-41. The court took into consideration that "[a] parent's interest in his or her child is a fundamental liberty interest that is protected by the Due Process Clause of . . . the United States Constitution." Id. at 841. The court also considered the purposes of TPR proceedings as set forth in the statute, which included: providing procedures "through which children and other interested parties are assured of a fair hearing and of the protection of their constitutional rights while protecting the public safety"; preserving the unity of the family whenever possible; providing children with permanent and stable relationships; promoting the adoption of children into stable families "rather than allowing them to remain in the impermanence of foster care"; and allowing the termination of parental rights "at the earliest possible time after rehabilitation and reunification efforts are discontinued." Id. at 841-42.

Recognizing that "[t]he balancing of the child's interest and the parent's interest in a TPR proceeding is difficult," the court reasoned that

> [t]he consequences of adopting [the County's] interpretation of conviction in this context [are] troubling.  If an appeal of a judgment of conviction is pending when the termination of parental rights occurs, there is the chance the judgment may be reversed.  There may be a new trial, which could result in either a guilty verdict or an acquittal.  If the reversal is due to the insufficiency of the evidence, the defendant cannot be retried.  Meanwhile, the parent's rights would have been terminated and the child possibly already adopted.
>
> The lack of finality of a conviction that is being appealed raises the question as to whether that conviction is clear and convincing evidence of parental unfitness.  That lack of finality also does not ultimately promote permanency and stability for the child.  Until the right to appeal has been exhausted, there is no certainty that the supposedly permanent arrangements made for the child will not be disrupted after a successful appeal.

Id. at 842-43 (citations omitted).  Therefore, the court concluded that "the correct interpretation of 'conviction' in [the statute] is a conviction after the appeal as of right has been exhausted."  Id. at 843.

The court subsequently clarified its holding as being limited to direct appeals that raise issues of guilt or innocence, rather than, for example, an appeal raising "only a sentencing issue that will in no way affect the determination of guilt."  In re Reynaldo F., 681 N.W.2d 289, 293 (Wis. Ct. App. 2004); see also In re Sonia G., 158 Cal. App. 3d 18 (Ct. App. 1984) (reasoning that "[a] judgment which is not yet final and may be reversed on appeal falls far short of the requirement of proof by clear and convincing evidence necessary to permanently sever a parental relationship," and expressing concern that "[i]f the term 'conviction' were to mean a mere finding of guilt, regardless of the outcome of an appeal, a child could be declared free from parental control, adopted, and then later claimed by the natural parent again after a ruling of reversal on said parent's criminal appeal"); Matter of D.D.F., 801 P.2d 703, 708 (Okla. 1990) (determining that because father's criminal convictions were pending on appeal, the convictions "are not final, and thus cannot be the basis for the termination of parental rights" under the statute); In re HC, 983 P.2d 1205, 1212 (Wyo. 1999) (explaining that because the mother's felony conviction was central to one of the grounds for termination, until the appeal of right was resolved, the conviction could not qualify under the termination statute as a "conviction").

Almost forty years ago, we recognized that "[t]he role of parents in the life of a family has attained the status of a fundamental human right and liberty." State v. Robert H., 118 N.H. 713, 715 (1978), overruled in part on other grounds by In re Craig T., 147 N.H. 739, 744-45 (2002). We also recognized that it is "firmly established that freedom of personal choice in the matters of family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment," and that "[th]e family and the rights of parents over it are held to be natural, essential, and inherent rights within the meaning of the New Hampshire Constitution, part I, article 2." Id. at 715-16 (quotation and ellipses omitted). Given that "[t]he permanent termination of the rights of parents over their children is even more final than involuntary commitment or delinquency proceedings," we held that "the government must prove its case under chapter 170-C beyond a reasonable doubt before the permanent termination of liberty and natural rights of parents . . . can occur." Id.; see In re Sophia-Marie H., 165 N.H. 332, 335 (2013).

We agree with the observation of the court in Kody D.V. that the consequences of interpreting the termination statute to permit termination of the parent-child relationship while an appeal of the underlying judgment of conviction is pending are "troubling." Kody D.V., 548 N.W.2d at 842. The lack of finality of a conviction that is being appealed raises the question whether DCYF has satisfied the heightened requirement of proving the grounds for termination beyond a reasonable doubt. See In re C.M., 166 N.H. at 773. In addition, although the judgment may be reversed on appeal and the parent subsequently acquitted, the child may already have been adopted. See RSA 170-C:15 (2014) (an appeal "shall not suspend the order of the court regarding the child"); see also RSA 169-C:24-a, II (2014) (concurrent with the filing of a TPR petition, DCYF "shall seek to identify, recruit, and approve a qualified family for adoption in accordance with the provisions of RSA 170-B, and in accordance with the principle that the health and safety of the child shall be the paramount concern"); RSA 170-B:21, II (2014) ("upon the expiration of one year after a final adoption decree is issued, the decree cannot be challenged by any person . . . in any manner upon any ground").

The stated purpose of RSA chapter 169-C includes providing "effective judicial procedures" that "recognize and enforce the constitutional and other rights of the parties." RSA 169-C:2, II(c). The stated purposes of RSA chapter 170-C include "strengthen[ing] and preserv[ing]" family life "whenever possible," and providing "a judicial process which will safeguard the rights of all parties concerned." RSA 170-C:1 (emphasis added). We acknowledge the State's interest in timely adoptions "in those cases in which reunification of parent and child is not possible—the goal being to provide the child with stable and permanent living arrangements as soon as reasonably possible." In re C.M., 166 N.H. at 775. However, "termination of a parent's legal bond to a child is a solemn and irreversible event." In re William A., 142 N.H. 598, 602 (1998). Taking into consideration the interests of both parents and children that are at

stake in termination proceedings, and the heightened standards we apply to such proceedings, we conclude that the legislature intended the terms "convicted" and "conviction" as used in RSA 169-C:24-a, I, and RSA 170-C:5, VI and VII, to mean an affirmance of guilt following a direct appeal as of right to this court that raises an issue of innocence or guilt. Of course, if the legislature disagrees with our construction of the statutory scheme, it is free to amend the statutes. See In the Matter of Fulton & Fulton, 154 N.H. 264, 268 (2006).

Thus, when a TPR petition is based only upon the parent's conviction of one of the crimes specified in the termination statute, or incarceration resulting therefrom, and the parent timely exercises his or her right to a direct appeal of that conviction, and therein raises an issue of innocence or guilt, the parent-child relationship may not be terminated until the resolution of that appeal. Cf. In re C.M., 166 N.H. at 774 (explaining that we construe all parts of the statute together to effectuate its overall purpose and avoid an absurd or unjust result). Accordingly, we hold that the trial court erred as a matter of law when it terminated the mother's parental rights while her direct appeal of the conviction that formed the statutory ground for the termination was pending.

Reversed and remanded.

DALIANIS, C.J., and HICKS and BASSETT, JJ., concurred.

14