NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court-Manchester Family Division
No. 2017-0498


PETITION OF NEW HAMPSHIRE DIVISION FOR CHILDREN, YOUTH AND FAMILIES

Argued:  February 1, 2018
Opinion Issued:  March 15, 2018


Gordon J. MacDonald, attorney general (Laura E. B. Lombardi, senior assistant attorney general, on the brief and orally), for the New Hampshire Division for Children, Youth and Families.


Sakellarios and Associates, LLC, of Manchester (Olivier Sakellarios on the brief and orally), for the respondent.


Nixon Peabody LLP, of Manchester (Jason A. Casey on the brief and orally), and CASA of New Hampshire, of Manchester (Betsy Paine and Caroline Delaney on the brief), for Court Appointed Special Advocates of New Hampshire, as amicus curiae.


HICKS, J.  The New Hampshire Division for Children, Youth and Families (DCYF) filed a petition for writ of certiorari, see Sup. Ct. R. 11, challenging

orders of the Circuit Court (Carbon, J.) closing a child protection case brought under RSA chapter 169-C (2014), and appointing the New Hampshire Department of Health and Human Services (DHHS) as guardian of the minor child pursuant to RSA 170-C:11, IV (2014). We reverse and remand.

I

The facts are not in dispute. In November 2014, DCYF filed a petition for neglect under RSA chapter 169-C against the respondent-mother alleging that she neglected her child by engaging in drug use and exposing the child to domestic violence in the home. See RSA 169-C:7 (2014). Following a hearing, the child was found to be neglected. In January 2015, the trial court held a dispositional hearing and issued orders requiring, among other things, that the mother: attend and meaningfully participate in substance abuse and/or mental health counseling; attend and meaningfully participate in visits with the child; follow the terms of her release from incarceration and remain free from incarceration; and obtain and maintain a home free from untreated substance abuse, mental health issues, and/or domestic violence.

At a three-month review hearing in April, the mother was found to be in "partial compliance." At a six-month review hearing in August, the mother failed to appear and was found to be "not in compliance." At a permanency hearing in December, the mother was again found to be "not in compliance," at which time DCYF recommended and the court ordered a change in the permanency plan from reunification to adoption and that DCYF file a termination of parental rights petition under RSA chapter 170-C to enable adoption to occur.

In October 2016, a hearing was held on DCYF's petition for termination of parental rights on grounds that the mother had failed to correct the conditions leading to the finding of neglect. See RSA 170-C:5, III (2014). The court denied the petition, finding that DCYF failed to meet its burden of proof as to the legal grounds for termination beyond a reasonable doubt. According to the court, DCYF did not present evidence of the mother's failure to correct the conditions that led to the finding of neglect despite DCYF's provision of reasonable efforts. The court also found that termination would not be in the child's best interest given her apparently "significant mental health issues," the lack of evidence of what services were offered to the child, and the fact that, if the court were to terminate the mother's parental rights, the child "would be in State care for an indeterminate period of time." In addition, the court noted that it was undisputed that the mother and child "have a strong bond," that the mother appeared to be taking her obligations seriously, and that, if appropriate care was provided to the child, and the mother could correct the conditions that led to the finding of neglect, "perhaps [the child] may be able to be returned to her mother's care." The court indicated that it would schedule a

second permanency hearing "for purposes of determining a new permanency plan."

The court subsequently determined that, rather than holding a new permanency hearing, it would conduct a dispositional hearing "to determine services to be provided to the family." Accordingly, in January 2017, the court held a dispositional hearing at which it "received input from all parties as to the future plan for [the child] and services to be afforded to her mother." DCYF recommended that the permanency plan be reunification with the mother, with the alternative plan being termination and adoption if the mother was unable to correct the conditions that led to the finding of neglect. The court stated that it would adopt the proposed orders as submitted and scheduled a review hearing to take place in May.

In February, however, the court, sua sponte, issued an order concluding that "the New Hampshire legislature has determined that guardianship should be awarded for a child, pursuant to RSA 170-C:11, IV, when a termination proceeding fails, but the Court nonetheless believes that the child's parental care requires substitution or supplementation." The court found the language of the statute mandatory, and that "[n]o discretion is provided in this context, assuming that the Court finds a need for substitution or supplementation." The court reasoned:

> It is clear . . . that there is a present need for substitution/supplementation of parental care for [the child]. Although [DCYF] failed to prove, beyond a reasonable doubt, that the grounds for termination exist, there is ample evidence that Mother has not fully complied with the outstanding dispositional orders, and has not been able to demonstrate that [the child] would not be endangered in the manner adjudicated if she were to be returned home. The Court cannot find that returning [the child] to her home is in her best interests. [See RSA 169-C:23.] Accordingly, the Court orders that the new permanent plan for [the child] is guardianship with the Department of Health and Human Services pursuant to the provisions of RSA 170-C:11.

The court stated that the review hearing in the child protection case previously scheduled for May would instead be treated as a guardianship review hearing, and that, thereafter, the child protection case "shall close and this matter shall be reviewed pursuant to the terms and conditions of" the guardianship statute, RSA chapter 463 (2004 & Supp. 2017).

DCYF moved for reconsideration, arguing, among other things, that the literal application of RSA 170-C:11, IV and the corresponding effect of closing the child protection matter "leads to an unjust result and is contrary to the

purpose of the Child Protection Act." DCYF asserted that the child protection case could not close "until [the child] is provided with a specific and appropriate permanent plan." According to DCYF, "[f]or the purposes of permanency, [DHHS] could not be an 'appropriate party' for guardianship" because "[t]he entire concept of permanency derives from the goal of children leaving the foster[/]residential care system" and "aspires towards children leaving the care and custody of the State." DCYF contended that the plan adopted by the court "places [the child] in the custody of the State for the remainder of her childhood," an outcome that "is inapposite of the purpose of both RSA 169-C and RSA 170-C."

The court denied the motion, noting that "[w]hile appointing [DHHS] as legal guardian may not be ideal, it is what the statute (RSA 170-C:11, IV) mandates where the Court finds that substitution or supplementation of parental care is in the child's best interests." The court requested that DCYF file a petition for guardianship in conjunction with filing motions to close both the abuse and neglect case and the termination of parental rights case. The court ordered that "DCYF will no longer be required to provide services to the child's parent," and that the court "will no longer be required to make a reasonable efforts determination."

At the hearing in May, DCYF argued that the RSA chapter 169-C child protection case should remain open for purposes of permanency planning and that closure of that proceeding and guardianship with the State is not one of the four enumerated permanency plans set forth in RSA 169-C:24-b (2014). Although the court expressed that it was "not happy with the outcome as it exists," it determined that "[it] is what the law provides." Subsequently, the court ruled that, pursuant to RSA 170-C:11, IV, "awarding guardianship with the department of health and human services . . . is the permanent plan for the minor child." In addition, the court ruled that, although it had previously dismissed the termination petition, upon further review of the statute, it had concluded that RSA 170-C:11, V and VI (2014) authorized it to hold open the termination case for the purpose of periodic review hearings. Accordingly, the court vacated its earlier order requiring the case to be reviewed as a guardianship pursuant to RSA chapter 463 and instead ordered that the termination case remain open for purposes of conducting review hearings under RSA 170-C:11, VI. The court thereafter denied DCYF's motion to reconsider and closed the RSA chapter 169-C abuse and neglect case. This petition followed.

II

DCYF argues that "the circuit court erred in closing the RSA 169-C child protection case before permanency for [the child] had been achieved." (Capitalization and bolding omitted.) According to DCYF, every child in an out-

4

of-home placement is entitled to a permanency plan and guardianship with DHHS is not one of the four permanency options identified by RSA 169-C:24-b. DCYF also asserts that, even if guardianship with DHHS qualifies as a permanency plan, RSA 169-C:24-c (2014) requires the court to keep open the child protection case so long as the child remains in an out-of-home placement, and that RSA 170-C:11 does not authorize the court to close a child protection case when a termination petition is dismissed. Finally, DCYF argues that "it was an unsustainable exercise of discretion for the circuit court to close the child protection case where doing so was not in [the child's] best interest." (Capitalization and bolding omitted.)

The mother counters that RSA 170-C:11, IV "is clear on its face," was interpreted correctly by the circuit court, and "is in accord with the overall purpose of the statutory framework." According to the mother, RSA 170-C:11, IV provides for the closure of the RSA chapter 169-C abuse and neglect case and the institution of a guardianship with DHHS "should termination of a parent[']s rights not occur[,] but where the child requires substitution or supplementation of parental care and supervision." "This eventuality," the mother asserts, "constitutes a permanent plan as contemplated under RSA 169-C:24-b." In addition, the mother argues that if the matter is remanded for the development of a second permanency plan, and termination of parental rights is again the chosen option, it "would be fundamentally unfair as there had just been a termination hearing and Res Judicata would prevent such a retrial."

III

"Review on certiorari is an extraordinary remedy, usually available only in the absence of a right to appeal, and only at the discretion of the court." Petition of Chase Home for Children, 155 N.H. 528, 532 (2007). Our review of a circuit court's decision on a petition for a writ of certiorari entails examining whether the court "acted illegally with respect to jurisdiction, authority or observance of the law or has unsustainably exercised its discretion or acted arbitrarily, unreasonably or capriciously." Id. "We exercise our power to grant such writs sparingly and only where to do otherwise would result in substantial injustice." Id.

Resolving the issues presented requires that we engage in statutory interpretation. As to questions of statutory interpretation, we employ a de novo standard of review. In re G.G., 166 N.H. 193, 195 (2014). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. Id. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. We interpret legislative intent from the statute as written and will not consider what the

5

legislature might have said or add language that the legislature did not see fit to include.  Id.  We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result.  Id.  We do not consider words and phrases in isolation, but rather within the context of the statute as a whole.  Id.  This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme.  Id. at 196.

IV

"The provisions of RSA chapter 169-C, the Child Protection Act, and RSA chapter 170-C, the Termination of Parental Rights statute, together set forth the procedures that apply to adjudicating petitions alleging abuse and/or neglect, and petitions to terminate the parent-child relationship."  In re S.T., 169 N.H. 441, 448-49 (2016).  Both RSA chapter 169-C and RSA chapter 170-C have been amended to bring New Hampshire into compliance with the requirements of the federal Adoption and Safe Families Act of 1997 (ASFA), 42 U.S.C. § 675(5)(C) (2012).  See Laws 1999, 133:1, :2, :3, :4; Laws 2007, 236:16.

"Congress enacted ASFA, in part, to speed critical decision-making for all children in foster care."  In re Juvenile 2005-426, 154 N.H. 336, 337 (2006) (quotation omitted).  The ASFA "promotes stability and permanence for abused and neglected children by requiring timely decisionmaking in proceedings to determine whether children can safely return to their families or whether they should be moved into safe and stable adoptive homes or other permanent family arrangements outside the foster care system."  Pub. L. No. 106-314, § 2(3), 114 Stat. 1266 (2000).

To that end, the ASFA requires that states adopt procedural safeguards "to assure each child in foster care under the supervision of the State of a permanency hearing . . . , which hearing shall determine the permanency plan for the child."  42 U.S.C. § 675(5)(C).  Accordingly, New Hampshire amended RSA chapter 169-C to add sections 24-b and 24-c.  Pursuant to RSA 169-C:24-b, when a child who has been found to be neglected or abused has been in an out-of-home placement for 12 or more months, the court must hold a permanency hearing.  RSA 169-C:24-b, I (2014).  Thereafter, if the standard for the child's return to the parent is not met, the court "shall identify a permanency plan" for the child.  RSA 169-C:24-b, II (2014).

A "permanency hearing" is defined as "a court hearing for a child in an out-of-home placement to review, modify, and/or implement the permanency plan or to adopt the concurrent plan."  RSA 169-C:3, XXI-b (Supp. 2017).  In turn, a "concurrent plan" is defined as "an alternate permanency plan in the event that a child cannot be safely reunified with his or her parents."  RSA 169-C:3, VII-a (Supp. 2017).

6

Like the ASFA, RSA 169-C:24-b lists, in order of preference, four nonexclusive options for a permanency plan: (1) reunification with the parent or parents; (2) termination of parental rights when an adoption is contemplated; (3) legal guardianship; or (4) another planned permanent living arrangement. RSA 169-C:24-b, II; see 42 U.S.C. § 675(5)(C). "Thus, the first option is reunification with the parents. If reunification is not appropriate, then the second option is adoption and a petition for termination of parental rights. If neither option is appropriate, the court must next consider referral for legal guardianship." In re Juvenile 2005-426, 154 N.H. at 338. "With respect to the fourth and least preferable option," another planned permanent living arrangement, "the court may order such a plan only in cases where the state agency has documented a compelling reason for determining that it would not be in the best interests of the child to order any of the other three permanency options." Id.; see 42 U.S.C. § 675(5)(C) (stating that where "the State agency has documented to the State court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, or be placed for adoption, with a fit and willing relative, or with a legal guardian," the child's permanency plan is placement "in another planned permanent living arrangement").

In addition, like the ASFA, RSA chapter 169-C requires the court to "hold and complete a post-permanency hearing within 12 months of the permanency hearing and every 12 months thereafter as long as the child remains in an out-of-home placement." RSA 169-C:24-c, I; see 42 U.S.C. § 675(5)(C). At such hearings, "the court shall determine whether the department has made reasonable efforts to finalize the permanency plan that is in effect." RSA 169-C:24-c, II.

Regarding the second option listed in RSA 169-C:24-b, II, RSA chapter 170-C provides for the "involuntary termination of the parent-child relationship by a judicial process which will safeguard the rights and interests of all parties concerned and when it is in the best interest of the child." RSA 170-C:1 (2014). "Implicit in this chapter is the philosophy that whenever possible family life should be strengthened and preserved, and that the parent-child relationship is to be terminated only when the adoption of that child may be contemplated." Id.

Pursuant to RSA 170-C:11, if the court finds grounds for terminating the parent-child relationship, "it shall terminate such relationship and appoint the department of health and human services or another authorized agency as guardian" of the child. RSA 170-C:11, II (2014). If the court does not find grounds for terminating the parent-child relationship, "it shall dismiss the petition; provided, however, that where the court finds that the best interest of the child requires substitution or supplementation of parental care and supervision, it shall make an order awarding guardianship with the

7

department of health and human services or an authorized agency and fixing responsibility for temporary child support." RSA 170-C:11, IV.

DCYF asserts that RSA 169-C:24-b "places permanency planning squarely in the jurisdiction of the child protective proceeding," and because RSA 170-C:11, IV "falls within the separate chapter dealing with termination of parental rights, it cannot reasonably be interpreted as authorizing the court to change a child's permanency plan in the context of a termination of parental rights proceeding." According to DCYF, "[w]here the permanency goal of termination and adoption has failed, the matter must return to the child protection case for the court to determine a new permanency plan," and doing so "is not inconsistent with the plain language of RSA 170-C:11, IV." We agree.

The legislature expressly intended that the statutory scheme set forth in RSA chapters 169-C and 170-C comply with the ASFA. See N.H.S. Jour. 1157 (1999) (stating that the purpose of amendments to RSA chapters 169-C and 170-C are "to initiate New Hampshire's compliance with" the ASFA, which is "designed and intended to . . . promote the safety, permanency and well being of children in out-of-home placements"); N.H.S. Jour. 650 (2007) (stating that amendments to RSA chapter 169-C are intended to move children "faster from foster care to permanent placement" and bring "the state laws in line with" the ASFA).

Given the overarching goal of the ASFA that abused and neglected children be provided with permanent arrangements outside the foster care system, we do not construe RSA 170-C:11, IV as mandating that, upon the denial of a petition to terminate parental rights, guardianship with DHHS is the child's permanency plan and the abuse and neglect proceeding is terminated. See In re A.G., 868 A.2d 692, 708 (Vt. 2004) (explaining that the ASFA's "primary purpose is to assure the safety of abused and neglected children and to eliminate the problem of foster care drift" (quotation omitted)). Indeed, in this case the court denied the petition for termination, in part, because doing so would leave the child in state care for "an indeterminate period of time," a result that was not in the child's best interest. Furthermore, even assuming without deciding that legal guardianship with DHHS constitutes "another planned permanent living arrangement" under RSA 169-C:24-b, II, such a plan may be ordered, as discussed above, only in cases where the state agency has documented a "compelling reason." In re Juvenile 2005-426, 154 N.H. at 338. DCYF made no such showing in this case.

Accordingly, based upon our review of the ASFA, RSA 169-C:24-b and :24-c, and RSA 170-C:11, we conclude that, when a child's permanency plan under RSA 169-C:24-b, II is adoption and termination of parental rights, and when the court denies the termination petition under RSA 170-C:11, IV, a new permanency hearing must be held to "review, modify, and/or implement the

permanency plan or to adopt the concurrent plan." RSA 169-C:3, XXI-b. As the statute provides, the court must then hold subsequent permanency hearings as long as the child remains in an out-of-home placement and must determine "whether the department has made reasonable efforts to finalize the permanency plan that is in effect." RSA 169-C:24-c, II.

Citing no supporting authority, the mother argues that, if the matter is remanded for the development of a second permanency plan and termination of parental rights is again the chosen option, it "would be fundamentally unfair as there had just been a termination hearing and Res Judicata would prevent such a retrial." We note, however, that other jurisdictions that have addressed this issue have declined to bar a successive petition to terminate parental rights on the basis of res judicata. See, e.g., People in Interest of J.R., 711 P.2d 701, 703 (Colo. App. 1985) (stating that the policy of limiting litigation "should not be applied so as to deprive the state in its role as parens patriae from seeking a resolution which will best serve the interests of the children"); In Interest of A.S., 752 P.2d 705, 711 (Kan. Ct. App. 1988) (concluding that a court must be free to "examine all of the circumstances, evidence, prior facts, prior orders, and other relevant information" in termination proceedings "in order to arrive at a correct conclusion"); In re Pardee, 475 N.W.2d 870, 873, 874 (Mich. Ct. App. 1991) (concluding that "when the facts have changed or new facts develop, the dismissal of a prior termination proceeding will not operate as a bar to a subsequent termination proceeding," stating that doctrine of res judicata "cannot settle the question of a child's welfare for all time"); Nassau Cty. Dept. of Social Serv., 640 N.Y.S.2d 153, 154-55 (App. Div. 1996) (rejecting mother's contentions that termination proceeding was barred by res judicata because earlier petition was dismissed, reasoning that evidence in the later petition concerned allegations of neglect not covered by the earlier petition); State ex rel. A.C.M., 221 P.3d 185, 191 (Utah 2009) (reasoning that "in child welfare proceedings res judicata does not bar courts from considering both newly discovered facts . . . and facts determined in previous termination proceedings when considering a later termination petition"); cf. In re Juvenile Appeal (83-DE), 460 A.2d 1277, 1282 (Conn. 1983) (explaining that, in cases involving successive petitions for termination of parental rights, the doctrines of preclusion "should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies"). As the Supreme Court of Utah explained, "to effectively determine the best interests of a child, a court must be free from the imposition of artificial constraints that serve merely to advance the cause of judicial economy," and, thus, "the State may reinitiate proceedings to terminate parental rights at any time and present any newly discovered evidence in those proceedings." State ex rel. A.C.M., 221 P.3d at 191 (brackets and quotations omitted).

9

The mother also makes a passing reference in her brief to her federal and state constitutional "rights of due process."  Because this constitutional argument is undeveloped, however, we refrain from addressing it.  <u>See</u> <u>Keenan v. Fearon</u>, 130 N.H. 494, 499 (1988) (explaining that "off-hand invocations" of constitutional rights "supported neither by argument nor by authority . . . warrant no extended consideration").

We hold that the circuit court erred as a matter of law in ruling that RSA 170-C:11, IV mandated closure of the child's RSA chapter 169-C child protection case and guardianship with DHHS as the child's permanency plan.  Accordingly, the case is remanded for proceedings consistent with this opinion.

<u>Reversed and remanded</u>.

LYNN, BASSETT, and HANTZ MARCONI, JJ., concurred.