NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court-Manchester Family Division
No. 2018-0269


IN RE C.O.;

IN RE G.L.

Argued: November 13, 2018
Opinion Issued: February 1, 2019


Gordon J. MacDonald, attorney general (Lindsey B. Courtney, attorney, on the memorandum of law and orally), for the petitioner.


McSwiney, Hankin-Birke, Wood & Christie, P.C., of New London (Sarah D. Christie on the brief and orally), for the respondent.


DONOVAN, J. The respondent appeals an order of the Circuit Court (Carbon, J.) terminating her parental rights over her two minor children, C.O. and G.L., on the ground that she failed to correct the conditions that led to the circuit court's finding that she neglected both children and abused G.L. See RSA 170-C:5, III (2014). She argues that the circuit court erred in finding that: (1) the New Hampshire Division for Children, Youth and Families made reasonable efforts to reunify her with her children after it terminated visits with her children; and (2) she failed to correct the conditions that led to the court's finding of abuse and neglect because one of the circuit court's conditions, that she accept responsibility for the underlying abuse, violated her constitutional right against self-incrimination. We affirm.

The record supports the following facts. The respondent is the biological mother of C.O. and G.L. The children have different biological fathers. Prior to March 2016, the children resided with the respondent and their maternal grandparents in Manchester.

In December 2015, DCYF received information that C.O.'s biological father, who is not a party to this appeal, sexually abused G.L. while the family lived in Tennessee. Pursuant to RSA 169-C:38, DCYF informed the Manchester Police Department of these allegations. Subsequently, a Manchester detective received multiple images of child pornography from Tennessee police, which were recovered from C.O.'s father's computer hard drive. Some of these images depicted the respondent and G.L. engaging in behavior that appeared to be sexual in nature.

Based upon this information, DCYF filed an ex parte petition in March 2016 to remove the children from the respondent's custody and C.O. from her father's custody. See RSA 169-C:6-a, I (Supp. 2018). DCYF also filed three abuse and neglect petitions against the respondent, alleging that she neglected both children and abused G.L., and two abuse and neglect petitions against C.O.'s father, alleging that he neglected C.O. and abused G.L. See RSA 169-C:7 (2014). The Circuit Court (Emery, J.) granted the ex parte petition, ordering DCYF to place the children in out-of-home placement. Following a preliminary hearing, the Circuit Court (Carbon, J.) found reasonable cause to believe that the children were abused and neglected by the respondent and C.O.'s father and ordered the children to remain in out-of-home placement. See RSA 169-C:15, I, III (2014).

In May, DCYF informed the circuit court that the State of Tennessee had indicted the respondent in April on charges stemming from the images referenced in DCYF's original petitions. Shortly thereafter, the Circuit Court (Emery, J.) held an adjudicatory hearing and concluded that the evidence substantiated the allegations of abuse and neglect set forth in DCYF's petitions against the respondent and C.O.'s father. See RSA 169-C:18, V (Supp. 2018). The court awarded legal custody of C.O. to DCYF and ordered her to remain in out-of-home placement. As for G.L., the court awarded legal supervision over her to DCYF but placed her in the physical custody of her biological father.

Pursuant to RSA 169-C:18, VII, the Circuit Court (Emery, J.) then held a dispositional hearing. See also RSA 169-C:19 (2014). Following the hearing, the court issued an order setting forth conditions the respondent must meet before the children could be returned to her care, as well as the services that DCYF must provide to the children and the respondent.[1] See RSA 169-C:21, II

---

[1] The circuit court also set forth conditions C.O.'s father must meet before C.O. could be returned to his custody. However, in the following months, C.O.'s father "willfully absented himself" from the remainder of the abuse and neglect proceedings, which eventually led to the termination of his

(2014).  The order required the respondent to "demonstrate an ability to parent [the children] in a safe, age-appropriate and consistent manner . . . [,] address outstanding criminal matters," and "accept responsibility for her conduct (bearing in mind her substantive and procedural due process rights in the underlying criminal matter)."  The circuit court also ordered that the respondent "shall not discuss any aspect of the criminal case with [G.L.] or [C.O.], except as otherwise authorized by [DCYF] in consultation with the child(ren)'s therapist(s)."  The order also required her to participate in visits and any necessary parenting education directed by DCYF, obtain counseling, and participate in G.L.'s medical, dental, educational, or therapy visits.

In September 2016, the Circuit Court (Emery, J.) held a three-month review hearing.  See RSA 169-C:24, I (2014).  The court found the respondent in partial compliance with the court's dispositional order, noting that she had participated in visits with the children, "[r]emained in regular and consistent contact with [DCYF]," and had "not discussed the criminal component of this case with the children."  However, the court noted that her "criminal charges have not yet been resolved," and concluded that the circumstances leading to the finding of abuse and neglect had not yet been corrected.  It ordered that G.L. remain under the supervision of DCYF and in the physical custody of her father and that C.O. remain in the custody of DCYF.

During the fall of 2016, the respondent participated in visits with the children.  A parent educator contracted by DCYF supervised the visits.  While both children initially attended the visits, eventually only G.L. attended because, according to the parent educator, C.O. refused to participate.  Subsequently, during the respondent's visit with G.L., the parent educator overheard the respondent discuss the criminal case against C.O.'s father with G.L. and, even after the parent educator instructed her to stop, she continued to do so until G.L. became upset.  Based upon this event and C.O.'s behavior surrounding visitation, DCYF determined that visits with the respondent were no longer in the children's best interests.  Thereafter, on or around December 22, DCYF facilitated a holiday visit between G.L. and the respondent, which was the last visit between the respondent and either of her children.

In January 2017, the Circuit Court (Carbon, J.) held a six-month review hearing, where it heard from all parties about the events that had transpired.  The court endorsed DCYF's decision to discontinue visits and ordered that visits "not be reinstated absent Court order" and "until further recommendation from [G.L.]'s new therapist."  Additionally, the court found that the respondent was again in partial compliance with the court's dispositional orders.  The court acknowledged that the respondent had attended each visit, remained in regular and consistent contact with DCYF,

parental rights over C.O.  At the time his parental rights were terminated, he had been convicted of criminal charges in Tennessee and was awaiting sentencing.

3

participated in individual counseling and in C.O.'s educational matters, and had refrained from speaking with C.O. about the criminal matter. However, the court found that her criminal charges remained unresolved, she failed to refrain from speaking about her criminal case to G.L., and she had "not demonstrated an awareness as to the wrongfulness of her conduct and its impact on both her children." The court's order also noted that the respondent did not believe that she "may say anything in these hearings due to the pending criminal court matters in Tennessee," even though "RSA 169-C:12-a provides that testimony in child protection proceedings shall not be admissible in criminal proceedings." According to the order, C.O. had, at some point, been placed with G.L.'s father. Accordingly, the court ordered both C.O. and G.L. to remain in his care.

In May, the Circuit Court (Carbon, J.) held a nine-month review hearing and found that the respondent was not in compliance with the court's dispositional orders, again noting that she had not resolved her criminal issues and had not demonstrated an awareness as to the wrongfulness of her conduct. The court ordered the children to remain in the care of G.L.'s biological father.

Finally, in June 2017, approximately 12 months after the original findings of abuse and neglect, the Circuit Court (Carbon, J.) held a permanency hearing. See RSA 169-C:24-b (2014). The court determined that the respondent had not met the standard to permit the return of the children to her custody. See RSA 169-C:23 (2014). The court found that the respondent was not in compliance with the outstanding dispositional orders because she had not "meaningfully participated in visits" due to their discontinuation "as a result of her repeated misconduct." See RSA 169-C:23, I. Furthermore, the court determined that she could neither demonstrate that the children would not be endangered nor that it was in the children's best interests to be reunited with her because, inter alia, she had not "demonstrated an awareness as to the wrongfulness of her conduct" or resolved her criminal issues. RSA 169-C:23, II-III. Accordingly, the circuit court ordered DCYF to file petitions to terminate the respondent's parental rights (TPR) as to both children, see RSA 169-C:24-a, I(a) (2014), awarded legal custody to DCYF as to C.O., and ordered the children to remain in the care of G.L.'s father and his wife, or, as to C.O., another placement at DCYF's discretion. Subsequently, DCYF and G.L.'s father filed TPR petitions to terminate the respondent's parental rights over C.O. and G.L., respectively. These petitions alleged that the respondent failed to correct within 12 months the conditions which led to the findings of abuse as to G.L. and neglect as to both children. See RSA 170-C:5, III (providing for termination of parental rights where the parent, "subsequent to a finding of child neglect or abuse under RSA 169-C, ha[s] failed to correct the conditions leading to such a finding within 12 months of the finding despite reasonable efforts under the direction of the [circuit] court to rectify the conditions").

The Circuit Court (Carbon, J.) held a final hearing on the petitions on March 29, 2018, during which it heard testimony from the parent educator and a family service worker (FSW) with DCYF assigned to this case. See RSA 170-C:10 (Supp. 2018). The court also heard briefly from the respondent, but she was not questioned, and did not provide testimony, about the underlying abuse and neglect. Following the hearing, the circuit court ruled that the respondent "failed to correct the conditions that led to the children's removal from her care, and that she cannot demonstrate that they would not be harmed in the same manner adjudicated if returned to her care." The court found that, "[t]hroughout these proceedings, [the respondent] has been unable or unwilling to accept any responsibility" or "even acknowledge that there was a problem." As support for this finding, the court cited the respondent's silence, stating that she "typically invoked her [Fifth] Amendment privilege against self-incrimination," and her failure to acknowledge wrongdoing even when she was confronted with the photographs. The court further noted that she could not "even acknowledge that anything 'wrong' has happened to the girls," and that, "[w]hen asked if she wanted to say anything [at the TPR hearing], . . . she wanted it to be known that she was a 'good mother.'" As to DCYF's role, the court found that "DCYF made all reasonable efforts to work with [the respondent] and provide her with services," even after visits were suspended. Finally, in finding that G.L.'s father and his wife wished to adopt C.O., and that his wife also wished to adopt G.L., the court determined that it was "in the children's best interests to be adopted."

Following the court's TPR order, the respondent moved for reconsideration. The circuit court denied the motion and this appeal followed.

Parental rights are "natural, essential, and inherent" within the meaning of Part I, Article 2 of the New Hampshire Constitution. In re Adam R., 159 N.H. 788, 792 (2010). Nevertheless, the fundamental rights of parents are not unassailable, and terminations of parental rights will be upheld if applicable due process requirements have been met. Id. Before a court may order the termination of parental rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt. In re S.T., 169 N.H. 441, 448 (2016); see RSA 170-C:5, I-VII (2014). Once a statutory ground is established, the court must then consider whether termination is in the child's best interest. In re S.T., 169 N.H. at 448. We will not disturb the circuit court's finding unless it is unsupported by the evidence or plainly erroneous as a matter of law. In re Zachary G., 159 N.H. 146, 153 (2009).

In the case before us, DCYF sought to terminate the respondent's parental rights based upon RSA 170-C:5, III. To rely upon RSA 170-C:5, III as grounds for termination, DCYF must demonstrate that: (1) the circuit court made a finding of child neglect or abuse under RSA chapter 169-C; (2) the parent failed to correct the conditions of abuse or neglect within 12 months of

the finding; and (3) DCYF made reasonable efforts under the direction of the court to rectify or correct the conditions. Zachary G., 159 N.H. at 153.

The respondent first argues that the circuit court erred in finding that DCYF provided services to her to correct the conditions that led to the findings of abuse and neglect. She contends that, contrary to the circuit court's finding, the evidence demonstrates that DCYF did not provide any services to her after her visits were suspended. The respondent therefore challenges the circuit court's conclusion based upon its factual findings, which we will not disturb unless the factual findings are unsupported by the evidence. See id.

In determining whether DCYF has made reasonable efforts to assist a parent in correcting the conditions that led to a finding of abuse or neglect, the court must consider whether the agency provided services that were accessible, available, and appropriate. In re C.M., 166 N.H. 764, 779 (2014); see RSA 169-C:24-a, III(c), IV. We have recognized that DCYF's ability to provide adequate services is constrained by its staff and financial limitations. In re Michael E., 162 N.H. 520, 524 (2011). Thus, DCYF must make reasonable efforts given its available staff and financial resources to maintain the legal bond between parent and child. Id. The word "reasonable" is the linchpin on which DCYF's efforts in a particular set of circumstances are to be adjudged. Id. at 524-25.

The circuit court found that, "[o]nce visits were suspended, DCYF continued to provide other services to [the respondent] as ordered, and updated [the respondent] on the children, although less frequently." Although the circuit court's order did not specify the services DCYF provided, the testimony at the TPR hearing supports this finding. For example, the FSW testified at the TPR hearing that she communicated with the respondent "about once a month" after visits were suspended, sent the respondent an e-mail with updates as to the children's schooling, health, and counseling following each of the FSW's home visits with the children, sent the respondent scanned copies of C.O.'s school work, and followed up with the respondent's counselor to ensure that she was attending and participating in counseling sessions. The FSW further testified that the respondent was in compliance with the court's order to obtain counseling and suitable housing, and therefore DCYF did not need to provide referrals to her for those services at that time. Despite the respondent's testimony that she saw "[z]ero" effort from DCYF to work with her toward reunification after visits were suspended, she acknowledged that she continued going to counseling, had moved into an apartment in November 2016, and received updates from the FSW about her children, although she testified that the updates temporarily stopped until her attorney contacted DCYF. Therefore, the respondent's testimony is consistent with the FSW's testimony and thus supports the circuit court's finding that DCYF continued efforts to reunify the respondent with her children, in light of the limitations imposed by the court's suspension of visits.

6

Nevertheless, the respondent contends that the FSW "testified that she could have provided more services, but didn't." To the contrary, the FSW did not testify that there were additional services that she could have provided to the respondent. Rather, she acknowledged only that she could have tried to obtain permission from the respondent to speak with the respondent's counselor to determine whether the respondent was making progress in acknowledging her wrongdoing. The circuit court's dispositional order did not require DCYF to monitor or report the content of the respondent's counseling sessions, and the respondent does not offer any explanation of how an attempt by the FSW to speak with the respondent's counselor would have constituted a reasonable effort by DCYF to assist the respondent in rectifying the conditions that led to the findings of abuse and neglect. See RSA 170-C:5, III (requiring a finding of "reasonable efforts under the direction of the [circuit] court to rectify the conditions" (emphasis added)); see also C.M., 166 N.H. at 779 (DCYF's "role is not to assume the full weight of the parents' responsibilities," and thus "[a] parent must make [her] own effort in conjunction with the efforts made by DCYF"). Thus, the evidence does not support the respondent's assertion that DCYF could have, but did not, make reasonable efforts to provide additional services.

The respondent also contends that DCYF provided no evidence to show there were any staffing or financial constraints that restricted DCYF from providing additional services. However, the statute does not require that DCYF demonstrate staffing or financial constraints to prove that it made reasonable efforts to assist in reunification. Rather, the circuit court must consider whether DCYF made reasonable efforts to assist in reunification in light of the agency's staffing and financial limitations. See Michael E., 162 N.H. at 525. The respondent does not identify any additional services that DCYF could have provided to her following the visitation suspension that would have assisted in reuniting her with the children, and the record does not show that the respondent requested, or the circuit court required, any services in addition to those expressly set forth in the dispositional order. See C.M., 166 N.H. at 779. Given that DCYF provided all services required by the dispositional order issued before the court suspended visitation, the evidence supports the circuit court's finding that DCYF "made all reasonable efforts to work with [the respondent] and provide her with services." It was, therefore, unnecessary for the circuit court to make any express findings as to DCYF's staffing and financial limitations.

Next, the respondent challenges the circuit court's finding that she failed to correct the conditions that led to the finding of abuse and neglect. She argues that the circuit court's condition that she accept responsibility in the abuse and neglect proceeding violated her constitutional right against self-incrimination by requiring her to incriminate herself to comply with the condition. Citing only the circuit court's orders during the abuse and neglect proceeding, she argues that the circuit court's determination that she failed to

7

comply with her case plan when she "refused to incriminate herself" had "inappropriately forc[ed her] to choose between two constitutionally protected rights" — her right against self-incrimination and her right to care for her children.

DCYF first argues that the respondent should have raised this challenge during the abuse and neglect proceeding rather than in an appeal of the circuit court's TPR order. DCYF characterizes the respondent's argument as a direct challenge to "the requirements of the [circuit] court's dispositional orders in the underlying abuse and neglect proceedings" under RSA chapter 169-C (2014 & Supp. 2018), which is "an entirely separate case" from TPR proceedings under RSA chapter 170-C (2014 & Supp. 2018). Because the instant appeal is of the circuit court's order terminating her parental rights under RSA 170-C:5, III, DCYF argues that any challenge to the circuit court's orders issued in the abuse and neglect proceeding under RSA chapter 169-C is not properly before us. We agree.

We begin by first reviewing the statutory framework governing both abuse and neglect proceedings and TPR proceedings set forth under RSA chapters 169-C and 170-C. RSA chapter 169-C establishes a judicial framework for "the adjudication of child abuse or neglect cases," RSA 169-C:2, I-II (Supp. 2018), a proceeding which is initiated by the filing of an abuse or neglect petition. See RSA 169-C:7, I (2014). When the circuit court finds that a parent has abused or neglected a child and orders the child removed from the parent's custody, the statute gives the parent the opportunity to regain custody of the child by complying with court-imposed conditions set forth in a dispositional order. See RSA 169-C:21 (requiring the court to issue a dispositional order upon a finding of abuse and neglect that includes "conditions the parent[] shall meet before the child is returned home"); RSA 169-C:23 (setting forth the standard for return of the child to the home, which includes compliance with the outstanding dispositional order). RSA chapter 169-C provides only one statutory right of appeal: an interested party may appeal the court's final dispositional order to the superior court for de novo review within 30 days of its issuance by the circuit court. RSA 169-C:28 (2014); see In re J.H., 171 N.H. 40, 46-47 (2018).

RSA chapter 170-C, on the other hand, is a statutory framework designed to "provide for the involuntary termination of the parent-child relationship by a judicial process," RSA 170-C:1 (2014), initiated by the filing of a petition to terminate parental rights. See RSA 170-C:4 (2014). RSA chapter 170-C sets forth several grounds to terminate parental rights, see RSA 170-C:5, including a parent's "fail[ure] to correct the conditions leading to [a finding of abuse or neglect under RSA 169-C] within 12 months of the finding despite reasonable efforts under the direction of the [circuit] court to rectify the conditions." RSA 170-C:5, III. Unlike RSA chapter 169-C, chapter 170-C

8

permits a party "aggrieved by any order or decree" of the circuit court to appeal to the supreme court. RSA 170-C:15 (2014).

Thus, while we recognize that "an initial petition alleging abuse and neglect often sets in motion a series of hearings that may ultimately result in termination of parental rights," abuse and neglect proceedings and TPR proceedings "are separate cases." C.M., 166 N.H. at 782 (Conboy, J., concurring specially); see RSA 169-C:7 (2014); RSA 169-C:24-a, I(a); RSA 170-C:4. Accordingly, we have declined to review challenges to an abuse and neglect proceeding in an appeal from the subsequent TPR proceeding. See In re O.D., 171 N.H. ___, ___ (decided October 23, 2018) (slip op. at 7) (parents' claim that they were entitled to the appointment of counsel in the original neglect proceeding could not be raised in an appeal of the subsequent TPR proceeding); see also C.M., 166 N.H. at 781 (father's argument in an appeal of a TPR decision that he was entitled to counsel in the original neglect proceeding was barred by res judicata because the court's dispositional order became final and binding when he did not appeal it).

Here, on appeal, the respondent directly challenges the constitutionality of the condition to "accept responsibility" imposed by the circuit court's dispositional order in the abuse and neglect proceedings, which became final and binding when the respondent did not appeal the order pursuant to RSA 169-C:28. See C.M., 166 N.H. at 781. The respondent references the findings of noncompliance with this condition in the circuit court's post-dispositional orders in the abuse and neglect proceeding. However, if the respondent desired to challenge the constitutionality of these findings, she could have sought relief by filing a petition for a writ of certiorari. See In re Bill F., 145 N.H. 267, 271 (2000). The respondent makes no argument that the condition or the circuit court's post-dispositional findings of noncompliance themselves rendered the circuit court's TPR decision unconstitutional. Even if she had, the circuit court's task during the TPR decision was to determine whether she failed to correct the conditions that led to the findings of abuse and neglect, not to make another determination of the validity of the dispositional order. We have repeatedly observed that a parent's compliance or noncompliance with orders issued in an abuse and neglect case is not dispositive in a TPR proceeding; rather, it is but one factor the circuit court may consider in addressing whether the conditions leading to the original finding of abuse or neglect have been corrected. See In re Haley K., 163 N.H. 247, 251 (2012). As such, the circuit court did not simply rely on the findings of noncompliance during the abuse and neglect proceedings. Instead, it made an independent determination as to the relevance of her unwillingness to acknowledge wrongdoing based on the evidence presented at the hearing and the nature of the underlying abuse and neglect. Accordingly, we conclude that the respondent's challenge to the circuit court's imposition of the condition to "accept responsibility" and its findings of noncompliance during the abuse and neglect proceeding is not properly before us in this appeal of the TPR order.

9

To the extent the respondent contends that the circuit court improperly considered her failure to acknowledge wrongdoing in its decision to terminate her parental rights, we conclude that the court did not err under the circumstances presented in this case. Although the respondent only tangentially challenges the circuit court's consideration of her failure to acknowledge wrongdoing in its TPR order, we will now address the substance of this issue consistent with this court's supervisory role, in the event another circuit court is confronted with similar circumstances.

Part I, Article 15 of the New Hampshire Constitution provides, in part, that "[n]o subject shall be . . . compelled to accuse or furnish evidence against himself." Similarly, the Fifth Amendment to the United States Constitution provides, in part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The privilege contained in the State Constitution is comparable in scope to the privilege in the Federal Constitution. Marchand, 164 N.H. at 31. We first address the respondent's claim under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

The privilege against self-incrimination permits an individual to refuse to testify against herself at a criminal trial in which she is a defendant, and also privileges her not to answer official questions put to her in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate her in future criminal proceedings. State v. Burris, 170 N.H. 802, 806 (2018). The purpose of this right is to prevent the compulsion and subsequent use of the defendant's testimony to establish her guilt in a criminal case. Id.

We have long recognized under our State Constitution that, in criminal proceedings, the defendant's decision not to testify at her criminal trial may not provide a basis for the jury to draw an adverse inference of guilt. State v. Ellsworth, 151 N.H. 152, 155 (2004); State v. Kelly, 113 N.H. 222, 223 (1973) ("The fact that an accused does not choose to testify in [her] own defense can provide no basis for an adverse inference [of guilt] or comment by the prosecutor."); see also N.H. R. Ev. 512(a)-(c). We have also held that a criminal defendant's invocation of the right to remain silent during custodial interrogation may not be used against the defendant at his or her criminal trial. State v. Munson, 126 N.H. 191, 192-93 (1985) (defendant's silence after his arrest could not be used against him at his criminal trial); see also State v. Neeper, 160 N.H. 11, 14 (2010) (the invocation of the right to remain silent after receiving Miranda warnings cannot be used as direct or impeachment evidence at trial). A TPR proceeding, however, is not a criminal proceeding, and we have not yet determined whether the State or Federal Constitutions allow the fact-finder in such a proceeding to draw an adverse inference from a parent's invocation of her right against self-incrimination.

Under the Federal Constitution, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." Baxter v. Palmigiano, 425 U.S. 308, 318 (1976). We have previously recognized that there are many factors that weigh in favor of permitting the fact-finder in a civil proceeding to draw a negative inference from a person's invocation of her right against self-incrimination. Fischer v. Hooper, 143 N.H. at 594 (interpreting former version of New Hampshire Rule of Evidence 512 as prohibiting the jury "in both civil and criminal cases from drawing negative inferences from the invocation of the right against self-incrimination"); see N.H. R. Ev. 512(d). First, excluding this information from the fact-finder's consideration undermines the fact-finder's search for the truth. Id. Second, most of the reasons for preventing the State from utilizing the invocation of the right against self-incrimination in a criminal case are far less persuasive in a civil case. Id.; see, e.g., Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509, 521 (8th Cir. 1984) (the necessity of the Fifth Amendment's protection of "criminal suspects from governmental coercion in the government's attempt to obtain criminal confessions" is not present in a private civil action (quotation omitted)).

Unlike other civil proceedings, however, a TPR proceeding involves the deprivation of a fundamental right — the right to raise and care for one's children. Adam R., 159 N.H. at 792; J.H., 171 N.H. at 51. Furthermore, similar to the State's burden in criminal proceedings, the petitioner in a TPR proceeding has the burden to prove a statutory ground for termination beyond a reasonable doubt. Adam R., 159 N.H. at 792. Nonetheless, the fundamental rights of parents are not unassailable. Id. Whereas in a criminal proceeding, "the State's sole interest is to convict," Baxter, 425 U.S. at 318-19, in a TPR proceeding, "the dominant consideration . . . is the welfare of the child, which prevails over the interests of the parents." Adam R., 159 N.H. at 792. Thus, a parent's constitutional right against self-incrimination that she would otherwise have in a criminal proceeding must yield where the welfare of a child is at issue. See Custody of Two Minors, 487 N.E.2d 1358, 1363-64 (Mass. 1986) ("As parens patriae, the State does not act to punish misbehaving parents but to protect children," therefore, "the full panoply of constitutional rights afforded criminal defendants does not apply in these cases.").

We have previously recognized that a "child falls within the definition of an abused and neglected child under the Child Protection Act" when the parent "shirks the responsibility to assist [the] child in coping with abuse or fails to recognize that the abuse occurred." In re Samantha L., 145 N.H. 408, 413 (2000) (holding that a parent's "refus[al] to acknowledge the abuse of a child" and "unwillingness or inability to protect the child from future abuse, . . . justify the transfer of custody to DCYF" following a dispositional hearing). Because the circuit court in a TPR proceeding under RSA 170-C:5, III must determine beyond a reasonable doubt whether the parent has failed to correct the conditions that led to the finding of abuse or neglect, see Adam R., 159

N.H. at 792, a parent's ability to acknowledge the abusive or neglectful conditions may be a relevant factor in making that determination. See Michael E., 162 N.H. at 525-26 (upholding the trial court's termination of the father's parental rights, which was based, in part, on the finding that he "never acknowledged that there were any neglectful conditions to be corrected" (quotations omitted)). Thus, where a parent's invocation of her right against self-incrimination during abuse and neglect proceedings is relevant to determining whether the parent has corrected abusive or neglectful conditions, affording the court the discretion to draw an adverse inference from the parent's silence may be essential to protecting the child's welfare. See In re Fay G., 120 N.H. 153, 156 (1980) (giving the probate court the discretion to compel a psychiatric examination where the parent's mental capacity is relevant to determining the parent's ability to care for the child). Without the discretion to consider the parent's silence, the court may be unable to meaningfully determine whether the parent has corrected the abusive or neglectful conditions. See id.

Moreover, the protection provided to parents who testify during abuse and neglect proceedings under the current statutory scheme provides additional support for allowing courts to consider a parent's silence in its determination. Pursuant to RSA 169-C:12-a, a parent's testimony given during abuse and neglect proceedings shall not be admissible in a criminal proceeding relating to the abuse or neglect allegations against the parent. Thus, this statute provides an avenue by which a parent may demonstrate that he or she has corrected the conditions that led to the findings of abuse and neglect without fear that his or her statements made during those proceedings will be admitted in a related criminal proceeding. In light of RSA 169-C:12-a, a parent's choice to invoke his or her right against self-incrimination during an abuse and neglect proceeding notwithstanding the protections provided by the statute may have a significant bearing on whether the parent has corrected the conditions that led to the findings of abuse or neglect. See In re G.G., 166 N.H. 193, 199 n.1 (2014) (Lynn, J., concurring specially) ("[RSA 169-C:12-a] provides additional impetus for the rule that permits the fact finder to draw an adverse inference against a litigant in a civil proceeding who chooses not to testify based on the exercise of the privilege against self-incrimination.").

Accordingly, we conclude that the circuit court may draw an adverse inference from a parent's failure to acknowledge wrongdoing where it is relevant to determining whether the parent failed to correct the conditions that led to the findings of abuse or neglect, even where the parent has invoked her right against self-incrimination. See Michael E., 162 N.H. at 525-26. Our holding is consistent with other jurisdictions that have considered similar issues. See, e.g., Custody of Two Minors, 487 N.E.2d at 1363 (trial court did not violate the parents' right against self-incrimination when it drew a negative inference from their failure to testify at the TPR hearing); In re Destiny D., 922 A.2d 168, 174 (R.I. 2007) (concluding that the trial court properly considered a

12

parent's refusal to testify "in light of all the other evidence" introduced at the trial of a petition seeking to terminate her parental rights); W. Va. Dep't of Health & Human Res. v. Doris S., 475 S.E.2d 865, 874 (W. Va. 1996) ("because the purpose of an abuse and neglect proceeding is remedial, . . . a [trial] court may properly consider [a parent's] silence as affirmative evidence of that individual's culpability" in a proceeding to terminate parental rights). Our decision should not be interpreted as approving, in any measure, a per se rule or condition that requires a parent to admit to wrongdoing to regain custody of her child under RSA chapter 169-C or to maintain her parental rights under RSA chapter 170-C. See RSA 169-C:23; RSA 170-C:5, III. Rather, we hold only that the circuit court is permitted to draw an adverse inference from a parent's failure to acknowledge wrongdoing where such an inference is relevant to determining whether to terminate parental rights under RSA 170-C:5, III.

The Federal Constitution offers the defendant no greater protection than does the State Constitution. See Santosky v. Kramer, 455 U.S. 745, 766-67 (1982); Adam R., 159 N.H. at 792. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

The respondent does not contend that her failure to acknowledge wrongdoing was not relevant to the determination of whether she failed to correct the conditions that led to the findings of abuse and neglect, nor does she challenge the weight the circuit court placed on her failure to acknowledge wrongdoing in its TPR decision. However, the respondent asserts that the circuit court did not properly consider that she was "threatened with being reported to law enforcement, if she complied with the case plan" when DCYF, at some unspecified time during the abuse and neglect proceeding, told her that it would inform law enforcement of any acknowledgment of wrongdoing. In its TPR decision, the circuit court acknowledged DCYF's representation to the respondent, but disregarded it based upon the protection afforded to the respondent under RSA 169-C:12-a. Given this statutory protection, we fail to see the relevance of DCYF's representation to our analysis. Regardless of any communication from DCYF to law enforcement of the contents of the respondent's testimony provided during the abuse and neglect proceeding, the statute bars the admission of such testimony in a related criminal proceeding against her. See RSA 169-C:12-a. To the extent that the respondent contends that DCYF's statement confused her as to the applicability or protections of the statute, we note that the circuit court's order on the six-month review expressly informed the respondent that "RSA 169-C:12-a provides that testimony in child protection proceedings shall not be admissible in criminal proceedings." If the respondent was concerned as to the scope of RSA 169-C:12-a, there is no evidence in the record that she raised her concern with the circuit court during the abuse and neglect proceeding. Thus, we conclude that the circuit court did not err when it disregarded DCYF's representation to the respondent in its TPR decision.

13

Given the nature of the abuse that led to the court's original findings of abuse and neglect, the circuit court did not err in reaching its TPR decision when it drew an adverse inference from the respondent's failure to acknowledge wrongdoing throughout the abuse and neglect proceeding. The circuit court's findings of abuse and neglect were based solely on evidence of sexual abuse perpetrated by the respondent and C.O.'s father. At the TPR hearing, the circuit court heard testimony from DCYF that the first step the respondent had to take to correct the abuse and neglect was to "[a]cknowledge that there is a problem." Even though the court informed the respondent that her testimony would not be admissible in the criminal proceeding under RSA 169-C:12-a, the respondent failed to avail herself of the protection provided by the statute. Thus, in reaching its conclusion that the respondent had not corrected the conditions that led to the findings of abuse and neglect, it was permissible under these circumstances for the circuit court to draw an adverse inference from the respondent's failure to acknowledge wrongdoing.

<u>Affirmed</u>.

LYNN, C.J., and HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.

14