NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by email at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

6th Circuit Court-Concord Family Division
Case No. 2024-0686
Citation: In re K.O., 2025 N.H. 39


IN RE K.O.

Argued: June 18, 2025
Opinion Issued: September 4, 2025

Shaughnessy Allard, PLLC, of Bedford (Kimberly A. Shaughnessy on the brief and orally), for the mother.


Jorel V. Booker, of Dover, on the brief and orally, for the father.


John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Mary A. Triick, assistant attorney general, on the memorandum of law and orally), for the New Hampshire Division for Children, Youth and Families.

DONOVAN, J.

[¶1] The parents of K.O. (child) appeal orders of the Circuit Court (Luneau, J.), issued following a hearing on the merits, terminating their parental rights over the child for failure to correct conditions that led to findings of child neglect within twelve months of those findings.  See RSA 170-C:5, III (2022).  The father argues that the trial court erred by not determining

that the petitioner, the New Hampshire Division for Children, Youth and Families (DCYF), failed to provide reasonable accommodations for his disability in the underlying child neglect case in light of his rights under the Americans with Disabilities Act (ADA). See 42 U.S.C. § 12132 (2013). The mother argues that the trial court erred by finding that: (1) she failed to correct the conditions that led to the finding that she neglected the child; (2) DCYF made reasonable efforts to assist her in correcting the conditions that led to the neglect finding; and (3) terminating her parental rights is in the child's best interest. We conclude that non-compliance with the ADA cannot be asserted as a defense in a termination proceeding. We further conclude that the evidence supports the trial court's findings regarding the mother's failure to correct the conditions that led to the neglect finding, DCYF's reasonable efforts and, ultimately, its termination decision. Accordingly, we affirm.

## I. Facts

[¶2] The trial court found, or the record otherwise supports, the following facts. K.O. was born in 2022 and is the parents' only child. Following K.O.'s birth, she lived with her mother in a shelter. Less than two weeks later, staff at the shelter contacted DCYF to report their concerns that the mother was failing to provide proper care to K.O. Staff at the shelter observed that the mother was unable to provide basic support for herself or for K.O. due to her cognitive disabilities. K.O. lost a "dangerous amount of weight" and was hospitalized after her pediatrician intervened. At the hospital, the mother required prompting to care for K.O.

[¶3] The father has an intellectual disability and did not reside with K.O. and the mother. He resided instead with his own mother, who would not allow K.O.'s mother into the residence. Although the father visited K.O. in the hospital, when K.O. was ready to be discharged, neither parent was available to take her. DCYF investigated and filed RSA chapter 169-C neglect petitions as to both parents.

[¶4] Following an adjudicatory hearing, the Circuit Court (Hersh, J.) issued an order finding that the evidence substantiated DCYF's petitions and found K.O. to be neglected. Specifically, it found that the mother lacked stable housing, was unable to properly care for K.O., and "was not appropriately interacting with the baby." The court found that the father "indicated that the baby could not reside in [his] home, and declined to take custody" of K.O. Based upon these findings, the court determined that K.O. could not be returned to her parents' care because the concerns that led to her initial removal from the mother's care had not been mitigated. Consequently, it awarded DCYF legal custody of K.O. and ordered that she be placed with relatives or in another placement. The court allowed the parents to have supervised visitation at DCYF's discretion, ordered the mother to submit to a

2

mental health evaluation, and ordered DCYF to provide services for both K.O. and her parents.

[¶5] The Circuit Court (Luneau, J.) subsequently held a dispositional hearing and issued an order in which it found both parents responsible for the neglect. The court's order set forth the conditions that the parents were required to meet before K.O. could be returned to their care, as well as the services that DCYF was required to provide. It ordered the parents to maintain safe and appropriate housing, "[m]eaningfully engage with a mental health provider and follow all [recommendations]," participate in visits with K.O. on a regular and consistent basis, consistently and meaningfully participate in parent education, "[d]emonstrate appropriate parenting skills and provide proper parental supervision for [their] child at all times." Additionally, the court ordered the parents to ensure that their child's ongoing needs are met, and "[c]ooperate with DCYF, service providers," and Court Appointed Special Advocates for Children of New Hampshire (CASA). The order specified the services that DCYF was required to provide, which included a parent aide to supervise the parents' visits with K.O. and provide instruction regarding parenting skills. In addition, the court appointed a guardian ad litem (GAL) for the mother.

[¶6] The court held periodic review hearings over the nine months that followed. In its orders, the court found that the parents were either in partial or "partial to substantial" compliance with the dispositional order. The mother attended K.O.'s medical appointments and made progress during supervised visits, but she struggled to adequately prepare for the visits, required assistance, and had difficulty interacting with K.O. "outside of well-rehearsed routines." The father attended K.O.'s medical appointments, although he argued with the mother at joint visits with K.O. and struggled to control his emotions. Neither parent was able to secure safe and appropriate housing. Both parents underwent psychological evaluations, and DCYF indicated that it would provide recommendations for specialized support.

[¶7] In each of the orders issued following the review hearings, the court found that DCYF had made reasonable efforts to "make it possible for [K.O.] to return to" her parents' care. It found that DCYF was providing the family with numerous services, including parental education, therapeutic and non-therapeutic support, housing and financial paperwork assistance, and transportation for K.O. To facilitate the parents' reunification with K.O., the court ordered DCYF to provide referrals for mental health providers, psychological evaluations, a child health support worker to supervise visits and provide parenting skill instruction, and additional case management services.

[¶8] The father filed motions to modify his case plan, requesting that the court "require DCYF to make recommendations that are a reasonable accommodation or modification" under the ADA "that would help him comply

with DCYF's requirements and the court's dispositional orders." The court denied the motions without prejudice based upon its finding that DCYF was already providing sufficient services to accommodate the father's disability.

[¶9] At the twelve-month permanency hearing, the court once again found that the parents were in partial compliance with the dispositional orders. It noted that the mother could not fully parent without supervision, had communication troubles, lacked safe and appropriate housing, and had cognitive disabilities. The court noted that the father had a job, but he lacked appropriate housing, had not engaged with mental health services, could not co-parent, had cognitive limitations, and would need significant help to parent K.O. Overall, it found that K.O. "may need significant support and oversight as she continues to grow"; neither parent could raise her alone, and neither had found someone who could help them raise K.O. As a result, it concluded that the parents had failed to establish that K.O. would not be "endangered in the manner adjudicated on the initial petition, if returned home," and, therefore, that K.O.'s return to the parents' custody was not in her best interest. Accordingly, the court established adoption through termination of parental rights as K.O.'s permanency plan.

[¶10] DCYF thereafter filed petitions for termination of both parents' parental rights on the ground that the parents failed to correct the conditions that led to the findings of neglect within 12 months of those findings. See RSA 170-C:5, III. The court held a final hearing on the termination petitions over the course of four days. During the final hearing, the court heard testimony from various DCYF employees who were involved in the case, such as the supervisor for the family services team and the family's clinical case manager. The court also heard from the father. Following the hearing, the father moved to dismiss the termination petition, arguing that, because DCYF did not recommend accommodations in the neglect case or otherwise perform its own assessment or evaluation of his disability, it failed to make reasonable efforts to assist him in correcting the conditions of neglect.

[¶11] The court issued final orders granting the termination petitions in November 2024. In ruling on the father's motion to dismiss, the trial court agreed with the father that he has a disability for purposes of the ADA. Noting the absence of New Hampshire case law on point, the trial court relied upon decisions from other jurisdictions and determined that, because the father is disabled, DCYF was required to "account for and, if possible, make reasonable accommodations for the [father's] disability when devising a treatment plan and providing rehabilitative services." Whether reasonable accommodations were made in the neglect case, according to the trial court, is relevant to whether DCYF made reasonable efforts to assist the father in accordance with RSA 170-C:5, III. Ultimately, the court found that DCYF did adjust and adapt its case plan and services to reasonably accommodate the father's disability for purposes of the ADA.

4

[¶12] The court further concluded that DYCF proved that the parents failed to correct the conditions that led to the finding of neglect and that termination of the parents' parental rights was in K.O.'s best interest. The court explained that K.O.'s pre-adoptive foster family was "an especially good fit for [K.O.]'s needs, and will enable her to grow and thrive." The father filed a motion for reconsideration, which the court denied. This appeal followed.

## II. Analysis

[¶13] On appeal, both parents challenge the trial court's decision to terminate their parental rights over K.O. The father argues that there was insufficient evidence that: (1) he failed to correct the conditions leading to the neglect finding in the RSA chapter 169-C case; and (2) DCYF made reasonable efforts to assist him in correcting those conditions in light of his rights under the ADA. The mother argues that the court erred in finding that: (1) she failed to correct the conditions that led to K.O.'s removal from her care; and (2) DCYF made reasonable efforts to provide her with services and assistance to correct those conditions. Both parents separately claim that terminating their parental rights was not in K.O.'s best interest.

[¶14] As a threshold issue, DCYF argues that the mother failed to preserve her argument that DCYF did not make reasonable efforts to assist her in correcting the conditions that led to the neglect finding. In addition, DCYF contends that the father failed to preserve his argument regarding whether he failed to correct the conditions that led to the neglect finding. At oral argument, the father conceded that he failed to correct the conditions that led to the neglect finding. Therefore, he waived any argument regarding this issue. See State v. Krueger, 146 N.H. 541, 542 (2001) (treating as waived ground for appeal conceded at oral argument). In addition, our review of the record reveals that the mother failed to contest DCYF's evidence and arguments that it made reasonable efforts to assist her. It is a long-standing rule that parties may not have judicial review of matters not sufficiently raised in the trial court. Bean v. Red Oak Prop. Mgmt., 151 N.H. 248, 250 (2004). Accordingly, we decline to address these arguments on appeal.

[¶15] Before the trial court may terminate a parent's rights based upon a petition filed by DCYF, DCYF must prove a statutory ground for terminating parental rights beyond a reasonable doubt. In re S.A., 174 N.H. 298, 299-300 (2021); RSA 170-C:10 (2022). One such ground is the parents' failure, "[s]ubsequent to a finding of child neglect . . . under RSA 169-C, . . . to correct the conditions leading to [the] finding within 12 months of the finding despite reasonable efforts under the direction of the court to rectify the conditions." RSA 170-C:5, III; S.A., 174 N.H. at 300. Whether a parent has complied with dispositional orders in the underlying child neglect case is a non-dispositive factor that the trial court may consider when determining whether the parent has corrected the neglect conditions. S.A., 174 N.H. at 300.

[¶16] When assessing DCYF's efforts to assist a parent in correcting conditions, the trial court must consider whether the services provided were accessible, available, and appropriate. Id. In view of the staffing and financial limitations that constrain DCYF's ability to provide services, we have emphasized that "[t]he word reasonable is the linchpin on which DCYF's efforts in a particular set of circumstances are to be adjudged." Id. (quotation and brackets omitted). "DCYF's role in neglect cases is not to assume the full weight of the parent's responsibilities, but to provide the parent assistance to deal with and correct problems." Id. "Reasonable efforts means doing everything reasonable, not everything possible." Id. "A parent must make her own effort in conjunction with the efforts made by DCYF." In re Michael E., 162 N.H. 520, 525 (2011) (quotation omitted).

[¶17] "Once a statutory ground for termination of parental rights is established, the court must then consider whether termination, or some alternative dispositional order, is in the child's best interest." S.A., 174 N.H. at 300. Unlike the statutory ground for termination, this element does not require proof beyond a reasonable doubt. See In re Shannon M., 146 N.H. 22, 27-28 (2001). "The dominant consideration is the welfare of the child, which prevails over the interests of the parent." S.A., 174 N.H. at 300.

[¶18] Parental rights are "natural, essential, and inherent" within the meaning of Part I, Article 2 of the New Hampshire Constitution. In re C.O., 171 N.H. 748, 755 (2019). Nevertheless, the fundamental rights of parents are not unassailable, and terminations of parental rights will be upheld if applicable due process requirements have been met. Id. When reviewing a trial court's termination decision, we will not disturb the circuit court's finding unless it is unsupported by the evidence or plainly erroneous as a matter of law. Id. at 756. In reviewing its findings, we are mindful that the trial court is in the best position to assess and weigh the evidence before it, and that our task is not to determine whether we would have found differently, but whether a reasonable person could have reached the same conclusions as the trial judge based upon the evidence presented. In re C.M., 176 N.H. 757, 760 (2024).

[¶19] We first address the father's argument that the trial court erred by not determining that DCYF failed to provide reasonable accommodations in light of his rights under the ADA. During the underlying neglect case, the father underwent a court-ordered psychological evaluation, which revealed a cognitive disability. Thereafter, he filed motions seeking to: (1) modify his case plan and compel DCYF "to make recommendations that are a reasonable accommodation or modification due to father's disability"; and (2) require DCYF to convene a meeting with representatives of certain agencies to assist it in recommending accommodations. The trial court denied his motions on the basis that DCYF was "already providing services and supports to the Father sufficient to address the concerns raised in the motions." The father also moved to dismiss the termination petition, arguing that, because DCYF did not

recommend accommodations in the neglect case or otherwise perform its own assessment or evaluation of his disability, it failed to make reasonable efforts to assist him in correcting the conditions of neglect. In its termination order, the trial court found that as a result of the psychological evaluation, DCYF in fact modified and adjusted its services and case plan "to adapt to [the father's] disability."

[¶20] On appeal, the father argues that, because DCYF did not conduct its own assessment or evaluation of his disability, and because it did not make recommendations to the court for accommodations pursuant to RSA 169-C:19, his rights under the ADA were violated. We disagree.

[¶21] Title II, § 202 of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. For purposes of the ADA, a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2) (2013). When Congress enacted the ADA, it found that the Act properly promoted the goal of assuring that individuals with disabilities have "equality of opportunity, full participation, independent living, and economic self-sufficiency." 42 U.S.C. § 12101(a)(7) (2013). As a result, the ADA seeks to "provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2) (2013).

[¶22] As the trial court noted, we have not had the occasion to determine whether the ADA applies to termination of parental rights proceedings. Cf. In re Jack L., 161 N.H. 611, 616 (2011) ("Even if we were to assume that DCYF or the court had a duty under the ADA to provide . . . ."). We therefore look to decisions issued by other courts for guidance. Under similar circumstances, the Vermont Supreme Court concluded that the ADA may not be raised as a defense in termination of parental rights proceedings. In re B.S., 693 N.E.2d 716, 720 (Vt. 1997). In that case, a mother with intellectual disabilities argued that the trial court erred in terminating her parental rights because the Vermont Department of Social and Rehabilitation Services (SRS) failed to accommodate her disability and, as a result, had discriminated against her by failing to provide her with the necessary services needed to parent her child. Id. at 719-20. The court, following the majority of courts that have considered this issue, concluded that "TPR proceedings are not 'services, programs or activities' within the meaning of Title II of the ADA" and, therefore, "the anti-discrimination requirement does not directly apply to TPR proceedings." Id. at

720; see also In re Elijah C., 165 A.3d 1149, 1164-65 (Conn. 2017) (explaining that, "consistent with the view of the vast majority of courts that have addressed the issue," the ADA is not properly raised as a defense in a termination proceeding "because such an action is not a service, program, or activity within the meaning of the ADA"). Consistent with our sister states, we conclude that termination of parental rights proceedings do not constitute "services, programs, or activities" for the purposes of the ADA, 42 U.S.C. § 12132, and, therefore, the ADA is not a defense in termination of parental rights proceedings.

[¶23] To the extent that the father argues that, notwithstanding his rights under the ADA, DCYF failed to make reasonable efforts to assist his efforts to correct the conditions that led to the finding of neglect, see RSA 170-C:5, III, we disagree. The trial court found, and the record amply supports, that DCYF provided the highest level of available services to the father and that the services provided were reasonable. The father does not address these findings, identify what additional adjustments to DCYF's services and case plan were necessary, or argue why DCYF's efforts were unreasonable. It is the father's burden on appeal to establish that the trial court erred and to support the issues he raises with developed legal argument. See Gallo v. Traina, 166 N.H. 737, 740 (2014); State v. Blackmer, 149 N.H. 47, 49 (2003). We conclude that the father has failed to establish that the trial court erred by determining that DCYF made reasonable efforts to assist him in correcting the conditions that led to the neglect finding. Any additional issues the father raises in his brief, including his assertion that the termination of his parental rights "is against the best interest needs of K.O.," are not fully developed and, thus, do not warrant further discussion or are waived. See Blackmer, 149 N.H. at 49.

[¶24] We next address the mother's arguments. First, she argues that the trial court erred by finding that she failed to correct the conditions that led to the finding of child neglect. DCYF removed K.O. from the mother's care shortly after her birth due to the mother's failure to provide basic care, which led to K.O.'s hospitalization. Thereafter, the mother failed to interact appropriately or bond with K.O. Throughout the neglect case, the mother never progressed beyond partially supervised visits with K.O. Although the mother was able to safely supervise K.O. within the "very controlled, routine environment" of her service provider's facility, she struggled when caring for K.O. in the community where she required assistance and intervention to avoid exposing K.O. to danger. By the time of the permanency hearing, the mother continued to struggle to meet K.O.'s basic needs, including feeding and changing her. According to DCYF's family services supervisor, the mother required "prompting assistance," including "which way the diaper went," "[s]upplying the correct supplies for what they were doing, [and] ensuring that those supplies were clean." She testified that the mother had a "lot of struggles still in the community." In addition, the mother had not yet obtained safe and

appropriate housing, and according to K.O.'s CASA, she did not have a strong bond with the child.

[¶25] Although the mother emphasizes other evidence to argue that she made progress in the neglect case, we defer to the trial court's evaluation of the weight of the evidence and the credibility of the witnesses. See S.A., 174 N.H. at 300. Moreover, "compliance or noncompliance with orders issued in the neglect case is not dispositive; rather, it is but one factor the trial court may consider in addressing the broader issue of whether the conditions leading to the original finding of neglect had been corrected." In re Haley K., 163 N.H. 247, 251 (2012). On this record, the trial court's determination that the mother failed to correct the conditions that led to the finding of child neglect was neither unsupported by the evidence nor plainly erroneous as a matter of law. See S.A., 174 N.H. at 300.

[¶26] Finally, we address the mother's argument that the trial court erred by finding that termination was in K.O.'s best interest. The evidence establishes that, but for a very short period of time following K.O.'s birth, she has not been in the mother's care, and that K.O. does not have a strong bond with her. By contrast, K.O. has bonded with her foster parents, who intend to adopt her and with whom she had lived for more than a year prior to the final hearing, and was "doing exceptionally well."

[¶27] K.O.'s CASA representative agreed that K.O.'s foster family "is committed to meeting her needs . . . for the rest of her childhood," and it was her "very strong recommendation" that the parents' "parental rights be terminated to free [K.O.] up for adoption." Similarly, K.O.'s permanency child protective service worker testified that terminating the parents' parental rights was in K.O.'s best interest "given that she has thrived in her current foster placement," that she "has all of her needs met in the current foster placement," that the foster parents "are committed to adopting her," and that the foster parents have not "wavered on their commitment to give [K.O.] the permanency that she deserves." See In re C.M., 166 N.H. 764, 775 (2014) (recognizing that children need and deserve permanent living arrangements). On this evidence, the trial court's finding that terminating the mother's parental rights was in the child's best interest was neither unsupported by the evidence nor plainly erroneous as a matter of law. See S.A., 174 N.H. at 300.

III. Conclusion

[¶28] For the foregoing reasons, we conclude that the father cannot, as a matter of law, raise the ADA as a defense in a termination of parental rights proceeding and that the evidence otherwise supports the trial court's finding that DCYF made reasonable efforts to assist the father in correcting the conditions that led to the neglect finding. We also conclude that the evidence supports the trial court's findings that the mother failed to correct the

conditions that led to the neglect finding and that termination of her parental rights was in K.O.'s best interest. Accordingly, we affirm the trial court's orders.

<u>Affirmed</u>.

MACDONALD, C.J., and COUNTWAY, J., concurred.